The Chicago Dock and Canal Company *v.* P. L. Garrity *et al.*

and

George Bullen *et al. v.* George W. Higgins *et al.*

*Filed at Ottawa November 14, 1885.*

1. STREETS—*location of railroad tracks thereon—power of control in that regard—mode of its exercise, limitations, etc.—and herein, as to the city of Chicago.* Under the ninth and twenty-fifth clauses of section 1, article 5, of the general Incorporation law, the common council of cities incorporated under that law is vested with the exclusive control and regulation of the streets of their cities, and with the power to direct and control the location of railroad tracks within the limits of their cities; and being inconsistent with the ninth clause of section 1, article 5, of the amended charter of the city of Chicago, adopted in 1867, must prevail over the latter. The provisions of the amended charter of the city of Chicago of 1867 being inconsistent with the general Incorporation law under which that city is now organized, must be regarded as not in force in that city.

2. But the power of the city council in this respect is subject to the limitation imposed by the ninetieth clause of section 1, article 5, of the act, making a petition of the owners of the land representing more than one-half the frontage of the street, necessary to the grant of the right to lay a railway track in any street of the city.

3. Clause ninety, of section 1, article 5, of the general Incorporation law, "that the city council or board of trustees shall have no power to grant the use of or the right to lay down any railroad tracks in any street of the city to any steam or horse railroad company, except upon a petition of the owners of the land," etc., is to be construed as including both corporations and individuals. The word "company," in the clause, must be held to embrace natural persons as well as corporations.

4. Under section 13, article 3, of the general Incorporation law, the yeas and nays are required to be taken upon the passage of all ordinances, etc., and the concurrence of a majority of all the members elected to the city council shall be necessary to the passage of any ordinance or proposition, except that in case of the sale of city or school property a vote of two-thirds of all the members elect is required. Therefore a majority, only, of all the members of the city council is required to grant the privilege of laying a railroad track in a street of a city, and this being inconsistent with the provisions of the amended. charter of the city of Chicago of 1867, on the same subject, requiring a vote of three-fourths of all the aldermen elect, the latter is repealed.

5. A city council, under the general Incorporation act, may grant to private individuals or to a private corporation the right to lay railroad tracks in the streets, connecting with public railway tracks previously laid, and extending to the manufacturing establishments or warehouses of those laying the tracks. In such case, the tracks so laid become, in legal contemplation, part of the railway with which they connect, and are open to the public, and subject to public control in all respects as other railway tracks.

6. The use of the streets of a city, however, whether for vehicles drawn by animals, for riding upon animals, for footmen, or for the passage of railway cars, must be for the public. No corporation or individual can acquire an exclusive right to their use or for merely private purposes.

7. RAILROAD CONNECTIONS—*of rights in respect thereto—and for what purposes.* Railroad tracks laid on streets of a city, connected with existing railroads, and extending to public warehouses, malt houses or manufacturing establishments, or to public wharves and landings, are in their nature public and for the public good, and all railroad companies are required by law to permit such connections to be made with their tracks.

8. WHARVES, *docks, etc.—whether of public or private character—as to the Chicago Dock and Canal Company.* Wharves, docks, piers, quays and landing places may be either public or private, according to the use to which they are devoted, although the property may be owned by private persons. Private property, if devoted to a use in which the public have an interest, becomes public, and subject to public control. So the property of the Chicago Dock and Canal Company, under its charter, is devoted to a strictly public use. Its right to exercise the power of eminent domain strengthens the view that it was created for public purposes only.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Bills were filed in these cases to enjoin the laying of railway tracks in Illinois street, in the city of Chicago. Answers were filed, not under oath, and the causes were referred to

the master in chancery to take and report the evidence. The master reported the evidence, and the court thereupon enjoined the defendants, as prayed in the bills. Appeals were prosecuted from these decrees to the Appellate Court for the First District. That court affirmed the decrees, and the records are brought to this court on error.

The substantial facts are: On the 9th day of June, 1879, the city council of Chicago passed an ordinance by a majority of all the aldermen elected, authorizing the Chicago Dock and Canal Company to lay railway tracks on Illinois street, east of St. Clair street, and on the 15th day of November, 1880, the city council passed another ordinance, by the same vote, authorizing George Bullen & Co. to lay down railway tracks on Illinois street, from the east line of St. Clair street to Pine street, a distance of one block. The Chicago Dock and Canal Company, prior to the passage of either of these ordinances, had railway tracks laid on Illinois street, connecting with the tracks of the Chicago and Northwestern Railway Company, in North Water street, leaving the distance of about one block in Illinois street, east of St. Clair street, unoccupied by tracks. If the tracks were laid under these two ordinances, it would make a continuous line from Pine street, along Illinois street, to a point of connection with the tracks already laid, and enable persons to use such new tracks, and run cars on to the main track of the Northwestern Railway Company, in North Water street. The Chicago and Northwestern Railway Company was authorized, in writing, by the Chicago Dock and Canal Company and George Bullen & Co., to construct the tracks authorized by the ordinances, and was about to lay the same. Garrity, Dreyer and Heaney were the owners of lots on the north side of Illinois street, east of St. Clair. The Higginses were owners of lots on the north side of Illinois street, between St. Clair and Pine, and their lots, therefore, abutted upon the parts of Illinois street sought to be used for railway tracks.

The Chicago Dock and Canal Company was a corporation created by act of the legislature. (Private Laws 1857, page 499.) The company was authorized to construct on their own lands and on the shore of Lake Michigan, in the navigable waters, wharves, docks, piers, etc., for the safety and accommodation of boats and vessels, and the advantageous use of their own property, wharves and docks. For that purpose they had authority to open canals, slips, etc., for the entrance of boats and vessels from the lake, and from the Chicago harbor and river. The company had power to buy and lease lands, and also to condemn under the Eminent Domain act. The corporation was empowered to vacate streets which passed through their own land, and to appropriate for their canals and other purposes so much of the east ends of the several streets passing through Kinzie's addition, between the lake shore and St. Clair street. Neither the Chicago and Northwestern Railway Company nor the Chicago Dock and Canal Company claims any rights in the premises, save and except under and by virtue of the ordinance in question. George Bullen & Co. were the owners of a malt house and a warehouse of class "C," at the corner of Illinois and Pine streets. The ordinance for the use of Illinois street, between St. Clair and Pine, was intended to give access by rail and car, from the malt and warehouse, to the tracks of the Northwestern Railway Company. The city was the owner of the fee of Illinois street, over which it was proposed to lay the tracks. Garrity, Dreyer and Heaney filed a bill against the Chicago Dock and Canal Company, the Northwestern Railway Company, Bullen, and Young, to restrain them from laying tracks in Illinois street east of St. Clair, and from making any connection with railroad tracks west of St. Clair, on Illinois street. George W. Higgins and Thomas J. Higgins at the same time filed a bill against Bullen and Young, to prevent them from laying tracks on Illinois street east of St. Clair, and in front of the warehouse of George Bullen & Co.

Mr. W. C. GOUDY, and Mr. W. A. MONTGOMERY, for the plaintiffs in error:

The city council had power to pass ordinances giving permission to lay railroad tracks in Illinois street. General act of 1872, art. 5, secs. 1, 7, 27, 49, 90; Tuley's Laws and Ordinances, 406.

Under the special charter it was held that the city council had power to grant such permission, and that the operation of cars on tracks in the streets was consistent with the use of the streets as public highways. *Moses* v. *Railroad Co.* 21 Ill. 522; *Murphy* v. *Chicago*, 29 id. 279; *Railroad Co.* v. *Hartley*, 67 id. 439; *Quincy* v. *Railroad Co.* 92 id. 21; *Stetson* v. *Railroad Co.* 75 id. 74.

The tracks authorized by the ordinances would not be private but public railways, and would become a part of the Chicago and Northwestern Railway Company's tracks. *Vincent* v. *Railroad Co.* 49 Ill. 41; *Railroad Co.* v. *People*, 56 id. 365; *Truesdale* v. *Grape Sugar Co.* 101 id. 561; *Mills* v. *Parlin*, 106 id. 60; *Getz's Appeal*, 3 Am. & Eng. Ry. Cases, 186.

The ordinance required only a majority vote of all the members elect of the city council. General Incorporation Law, secs. 8, 13, 19, art. 3, and sec. 6, art. 1.

The general revision in the act of 1872, on the subject of the powers of the city council and the mode of passing ordinances, must be held as an exclusion of all other modes, and repeal the old charter by implication. *Culver* v. *Third National Bank*, 64 Ill. 534; *Andrews* v. *People*, 75 id. 613; *Devine* v. *Cook County*, 84 id. 595.

The act of 1872 having fixed the mode of passing ordinances, that mode excludes all others. *Gaddis* v. *Richland*, 92 Ill. 121. And see Potter's Dwarris, 155; *Dingman* v. *People*, 51 Ill. 277; *Devine* v. *Cook County*, 84 id. 595; *Chicago* v. *Bross*, 9 Bradw. 406; *Law* v. *People*, 87 Ill. 402.

An injunction will not be granted to prevent the laying of railroad tracks in a public street, where the fee is vested in the public. *Stetson* v. *Railroad Co.* 75 Ill. 74; *Patterson* v. *Railroad Co.* id. 588; *Railroad Co.* v. *Schertz,* 84 id. 135; *Railroad Co.* v. *People,* 92 id. 170.

The same has been applied where the track proposed to be laid was by a private company to a factory. *Truesdale* v. *Grape Sugar Co.* 101 Ill. 561; *Mills* v. *Parlin,* 106 id. 60.

Messrs. M. A. RORKE & SON, for part of defendants in error:

Where a valid corporation assumes to exercise licenses or powers by virtue of invalid ordinances, a court of equity has jurisdiction to restrain it. *Attorney General* v. *Railroad Co.* 112 Ill. 520.

As to distinction between a public and a private railroad, see *Kœlle* v. *Kencht,* 99 Ill. 396. Neither of the donees named in the ordinances are the proprietors of any steam or horse railroads.

The present charter does not contain substantially the same provisions as the old one on the subject of granting the privilege of constructing railroad tracks in the streets. Clause 90 of section 62, article 5, is a direct limitation on the power of the city council.

Clause 25, giving power "to provide for and change the location, grade and crossings of any railroad," (Hurd's Stat. 1885, p. 224,) refers only to railroad companies, and not to private individuals or corporations. This clause was doubtless intended to relate to such railroad companies as were already using the streets under prior grants, and clause 90 to future grants.

Although the fee of the streets is in the city, it holds it in trust for the common and equal use of her citizens, and it violates the trust when it appropriates a street to an individual or private use by which the public is not benefited in any way. Dillon on Mun. Corp. sec. 521, note.

An ordinance regulating the use of a street is a legislative act, and must be for the benefit of all citizens of the municipality, or it is void. The city council can not grant rights or franchises in a public street to one which are not granted or are denied to others. If it does so, the ordinances are unreasonable, and therefore void. *Tugman* v. *Chicago,* 78 Ill. 405; *Bailing* v. *West,* 29 Wis. 307.

The cases cited by plaintiffs in error have no application to the cases presented by this record. They were under a different law, containing an express grant of power to direct and control the location of railroad tracks, in which respect it was much stronger and different from the "City act of 1872."

The ordinances did not receive the requisite number of votes. We claim that clause 9, of the act of 1867, requiring a vote of three-fourths of all the aldermen elected to pass such an ordinance, is in force yet in the city. Hurd's Stat. 1885, p. 217.

The repeal of a law by implication is not favored. *City of East St. Louis* v. *Maxwell,* 99 Ill. 439; *Hume* v. *Gossett,* 43 id. 297; *Booth* v. *Schuyler,* 4 Gilm. 221; *Town of Ottawa* v. *La Salle County,* 12 Ill. 339.

If the two acts by a reasonable construction may both stand, the later law will not repeal the prior one by implication. *Card* v. *McCaleb,* 69 Ill. 314; *Covington* v. *East St. Louis,* 78 id. 549; *Wragg* v. *Penn Township,* 94 id. 11; *City of Champaign* v. *Harmon,* 98 id. 491; *Holton* v. *Daly's Admx.* 106 id. 131; *Chicago* v. *Quimby,* 38 id. 274.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The first question discussed in the arguments on behalf of the respective parties relates to the mode of exercising the power by the city council to pass an ordinance authorizing the location of railway tracks in the streets of the city of Chicago. Both sides agree that the city council has power

to that end, but they disagree as to the statute by which it is conferred, and, as a consequence, as to the limitations under which it can be exercised.   The city of Chicago was organized under the general law in relation to the incorporation of cities, etc., at the time of the passage of the ordinances in controversy here, and plaintiffs in error contend that the ninth and twenty-fifth clauses of section 1 of article 5 of that law (1 Starr & Curtis, 465,) confer the power, and that it is subject only to the limitations contained in clause ninetieth of the same section, and in section 13 of article 3 of the same law, while the defendants in error contend that the power is conferred by the ninth clause of section 1 of article 5 of the amendment to the charter of the city of Chicago, of March 9, 1867, (vol. 1, Private Laws of 1867, p. 771,) and subject to the limitations contained in that section, as well as to those contained in the ninetieth clause of section 1 of article 5 of the general Incorporation law.

It is provided by section 6 of article 1 of the general Incorporation law, that "from the time of such organization or change of organization, the provisions of this act shall be applicable to such cities and villages, and all laws in conflict therewith shall no longer be applicable; but all laws or parts of laws not inconsistent with the provisions of this act shall continue in force, and applicable to any such city or village, the same as if such change of organization had not taken place." And it therefore becomes necessary to inquire whether the ninth clause of section 1 of article 5 of the amended charter of 1867 is inconsistent with the provisions of the general law.   That clause provides that the city council shall have power "to authorize the use of the streets and alleys in said city by railroad companies, or city railway companies, for the purpose of laying tracks and running cars thereon: *Provided, however*, permission or authority shall not be given, nor shall any such grant or permission already given be extended, unless by vote at least of three-fourths of all the aldermen

elected, such votes to be entered, by ayes and noes, on the records of the council: *And provided, further*, that no grant, consent, contract or permission heretofore given or made, or hereafter to be made or given, shall in any case be extended until within one year of the expiration of such grant, consent, contract or permission: *And provided, further*, that in case of a veto by the mayor, any such grant or permission shall receive the votes of three-fourths of all the aldermen elected, to take effect as an act or law of the corporation." The ninth clause of section 1 of article 5 of the general Incorporation law confers power upon the city council to regulate the use of streets, and the twenty-fifth clause of the same section confers power upon the common council in these words: "To provide for and change the location, grade and crossings of any railroad." Eliminating all the words not pertinent to the power here in question, it reads: "To provide for * * * the location * * * of any railroad."

In *Moses et al.* v. *Pittsburgh, Fort Wayne and Chicago Railroad Co.* 21 Ill. 522, and *Murphy* v. *Chicago*, 29 id. 279, the charter vested the common council with the exclusive control and regulation of the streets of the city, and with power "to direct and control the location of railroad tracks," (see Public Laws of second session, 1849–51, "Act to reduce the law incorporating the city of Chicago, and the several acts amendatory thereof, into one act," etc., pp. 145, 146, clauses thirtieth and forty-ninth, of section 4, chapter 4,) and it was held that this conferred power upon the common council to authorize the location of the railway tracks in the streets. Following that ruling, it must be held there was like power conferred by the ninth and twenty-fifth clauses of section 1 of article 5 of the general Incorporation law. The power to regulate the use of the streets, although not so expressly declared, is, in the latter act, as exclusive as in the former, and the word "regulate," as used in the latter act, embraces everything included within the meaning of "control

and regulation," in the former. "Control" is a necessary incident of "regulation," and it is implied in the latter act as clearly as it is expressed in the former. So, also, "to provide for the location of any railroad," is clearly as comprehensive as "to direct and control the location of railroad tracks." "To provide for," implies, of necessity, power "to direct and control," for the location can only be in conformity with the mode provided for,—*i. e.*, in subordination to the direction and control prescribed by the ordinance.

But, in our opinion, this power is subject to the limitation imposed by the ninetieth clause of section 1 of article 5, which declares: "The city council or board of trustees shall have no power to grant the use of, or the right to lay down, any railroad tracks in any street of the city, to any steam or horse railroad company, except upon a petition of the owners of the land representing more than one-half of the frontage of the street, or so much thereof as is sought to be used for railroad purposes." It is very clear that "natural persons" are here within the intention, although not within the letter, of the act, for the injury against which protection is intended to be afforded is the laying of railway tracks in the streets. By whom the tracks shall be laid and the cars thereon operated, is, manifestly, of no consequence whatever. The same result, in all respects, will follow the laying of railway tracks in the streets and operating cars thereon by individuals, as will follow the laying of them by corporations. The use of the word "company," we have no doubt, was simply because such tracks are almost always laid and operated by companies. The clause should be read as including both corporations and individuals. *Perry County* v. *Jefferson County*, 94 Ill. 214; *St. Louis, J. and C. Railroad Co.* v. *Trustees*, 43 id. 303.

This, it will be observed, is not a grant of power, but a limitation upon a power assumed to be granted by some other provision of the same statute, for this statute professes to be a complete city charter in and of itself, without reference

to other statutes; and since no one claims that any other than the ninth and twenty-fifth clauses can be construed to be a grant of power to lay tracks in the streets for steam railways, the reasonable inference is, that the legislature intended the ninetieth clause as a limitation upon the power granted in those clauses. · Assuming, then, that the common council are vested with this power, subject to this limitation, section 13 of article 3, of the same statute, directs in what manner that body shall exercise it. It provides that "the yeas and nays shall be taken upon the passage of all ordinances, and on all propositions to create any liability against the city, or for the expenditure or appropriation of its money, and in all other cases, at the request of any member, which shall be entered on the journal of its proceedings; and the concurrence of a majority of all the members elected in the city council shall be necessary to the passage of any such ordinance or proposition: *Provided,* it shall require two-thirds of all the aldermen elect to sell any city or school property." This proviso adds force to the comprehensiveness of the general language in the first part of the section, and conclusively shows that it was not intended that the concurrence of more than a majority of the members elected to the city council should be indispensable to the passage of an ordinance in relation to any other subject than that of selling any city or school property. The maxim, "*expressio unius est exclusio alterius,*" is applicable. Broom, in his work on "Legal Maxims," under this head says: "A statute, it has been said, is to be so construed, if possible, as to give sense and meaning to every part, and the maxim was never more applicable than when applied to the interpretation of a statute." 4th ed. pp. 419-420, *512.

Here, then, we have, upon the same subject, inconsistent requirements. Under the amendment of the city charter of 1867, permission or authority to lay tracks in the streets shall not be granted by the city council unless by a vote of

at least three-fourths of all the aldermen elected. Under the general Incorporation law, such permission or authority may be granted by a vote of a majority of all the members elected in the city council. It can not be said that the provisions of the general law are supplementary to the amendment of 1867, or that that amendment is supplementary to the general law, for no exception in its favor is made in the general law, and that law assumes to provide a system the details of which are complete. To illustrate: The amendment of 1867 has no application, in any view, to any other city than Chicago. The general law applies to every city in the State organized under it. In every city not previously organized under a special charter, and in every city previously organized under a special charter not containing provisions authorizing the laying of railway tracks in the streets, either there is a denial of power to lay railway tracks in the streets, or that power is granted by the clauses in section 1 of article 5, to which we have referred, and, as we think we have satisfactorily shown, it is granted by those clauses. Then, as to those cities, we would have a system in force prescribed by the general law, while in the city of Chicago, organized under the same law, we would have a different system in force prescribed by a former special law. What other provisions of the former special charter might not be perpetuated in the same way? We have repeatedly held there is no authority under the constitution to perpetuate, under general laws, dissimilar and discordant provisions of municipal government. The provisions of the amendment of 1867 are inconsistent with the provisions of the general law upon the same subject, and are therefore not applicable to the city of Chicago since it organized under the general law.

But the point is made that the grants, by virtue of these ordinances, are to a private corporation and to private parties, and they are illegal for that reason. All railway companies in this State are private corporations, but the *use* of

the railways is public, and this authorizes the condemnation of private property for right of way, etc. 1 Redfield on Railways, (3d ed.) 53, and Cooley's Const. Lim. (1st ed.) 530-31, *et seq.* It is not claimed that the use of the streets can be permanently granted for private purposes, and we recognize as unquestionable law that the use of the streets, whether for vehicles drawn by animals, for those riding upon animals, for footmen, or for the passage of railway cars, must be for the public, and that no corporation or individual can acquire an exclusive right to their use or the use of any part of them for private purposes. But we have held that there may be a grant to private individuals of the right to lay tracks in the streets connecting with public railway tracks previously laid, and extending to the manufacturing establishments of those laying the tracks; but in such cases the tracks so laid become, in legal contemplation, to all intents and effects, tracks of the railway with which they are connected, and open to the public use and subject to the public control in all respects as other railway tracks open to public use. We have not regarded the circumstances that they were laid with private funds, and that they terminated opposite or within convenient contiguity of a private manufacturing establishment, as materially affecting them, and giving a private character to their use. All termini of tracks and switches are more or less beneficial to private parties, but the public character of the use of the tracks is never affected by this. If they are open to the public use indiscriminately, and under the public control to the extent that railroad tracks generally are, they are tracks for public use. It may be, in such cases, that it is expected, or even that it is intended, that such tracks will be used almost entirely by the manufacturing establishment, yet if there is no exclusion of an equal right of use by others, and this singleness of use is simply the result of location and convenience of access, it can not affect the question. *Truesdale* v. *Grape Sugar Co.* 101 Ill. 561; *Mills* v. *Parlin,* 106 id. 60.

The Chicago Canal and Dock Company is a private corporation created by an act of the General Assembly approved February 12, 1857. (Private Laws of 1857, p. 499.) Power is given to the company by section 4 of that act "to inclose, to make and protect, and also to erect and construct on their own lands, and on the shore, and in the navigable waters of Lake Michigan, * * * wharves, docks, moles, piers, breakwaters, and such other erections, protections, improvements and conveniences for the safety and accommodation of boats and vessels, and the security and advantageous use of their own property, wharves and docks, or for the purpose of convenience in the use and enjoyment of said property by the said company, as the board of directors of said company may deem necessary and proper." The 5th section empowers the company to dig basins, canals and slips, erect embankments, etc., and preserve and maintain the same for the entrance of boats and vessels of all kinds from the lake, and also from the Chicago harbor and river, etc. The 6th section authorizes the company to buy and hold land for corporate purposes. The 7th section authorizes the company to take lands by condemnation, and the 9th section authorizes the company to vacate streets on their own lands.

Dillon, in his work on Municipal Corporations, (1st ed.) section 68, says: "Wharves, piers, quays and landing places may be either *public or private.* They may be, in their nature, public, although the property be owned by an individual. If *private,* the public have no right to use the erections without the owner's consent, express or implied; if public, they may be used by persons generally, upon the payment of a reasonable compensation." And again, in section 69, he adds: "The keeping of a wharf or dock, erected and opened to the public, like the keeping of an inn, confers a general license to boats and vessels to occupy it for lawful purposes,—a license which can only be terminated by notice and request to remove the vessel. When thus established, the owner, at

common law, is, as respects the public, bound to keep it in good repair," etc. The Chief Justice, in delivering the opinion of the court in *Munn* v. *Illinois,* 94 U. S. (4 Otto,) 126, said: "Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created."

It is thus clear that the property of this corporation is devoted to a public use, although its ownership is private. The entire business of the corporation is with the public. It can own no vessels; and its property can be used for profit only for the accommodation of the public. In conferring the power of eminent domain upon it, the legislature gave the strongest possible confirmation of the view that it is created for public purposes only. The Chicago and Northwestern Railway Company is also a private corporation, created for a public purpose,—namely, the construction and operation of a great line of railway. Two tracks were built by the Chicago Canal and Dock Company, connecting with the main track of the Chicago and Northwestern Railway Company, and extending thence— one track along Water street to a basin of the canal and dock company, and the other diagonally, in a north-easterly direction from Water street, across lots belonging to the company, —to Illinois street, and thence eastwardly along Illinois street to Lake Michigan. These tracks then became, under the rulings of the cases before referred to, and in fact, railway tracks for public use,—extensions, in practical effect, of the lines of the Chicago and Northwestern Railway Company. They were built by a corporation whose franchise was exercised solely for the public use, extending the lines of a railway operated for the public use, and so we can not assume it was intended that their use should be other and different

than that of the corporation by which they were built, and the corporation of whose lines they are practically extensions. The ordinance now under consideration, which authorizes the canal and dock company to lay railway tracks in Illinois street, authorizes simply a track to be laid in that street westward from the point where the track just mentioned is laid in Illinois street, to the east line of St. Clair street,—making a western extension, by that much, of the track already in Illinois street. It must follow, if the track already in Illinois street is for a public use, this is so also, for, in effect, it is but an extension of the same track. The ordinance authorizing Bullen & Co. to lay a track in Illinois street, authorizes, simply, a still further extension of the same track westwardly,—that is, from the east line of St. Clair street to the west line of Pine street,—a distance of one block. Bullen & Co. are the owners of a malt house, and a warehouse of the class "C," at the corner of Illinois and Pine streets, and so their business also is for the public use, under the constitution and laws of this State. The first section of article 13 of our constitution provides: "All elevators or storehouses where grain or other property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses." And the fifth section of the same article requires that "all railroad companies receiving and transporting grain, in bulk or otherwise, shall deliver the same to any consignee thereof, or any elevator or public warehouse to which it may be consigned, provided such consignee, or the elevator, or public warehouse, can be reached by any track owned, leased or used, or which can be used, by such railroad companies; and all railroad companies shall permit connections to be made with their track, so that any such consignee, and any public warehouse, coal bank or coal yard, may be reached by the cars on said railroad."

It is thus made clear, beyond controversy, that this warehouse is a public warehouse,—that the Chicago and North-

western Railway Company could not, if they would, have declined allowing this connection to be made, and that the track itself is, necessarily, for public use.

Some objection is urged that these tracks are not so direct as they might be, for the purpose of connecting with the Chicago and Northwestern railway. That is not a matter affecting the power of the city council,—it addresses itself purely to the judgment and discretion of the members of that body. The case of *Koelle* v. *Knecht*, 99 Ill. 396, is not analogous. Such a switch or spur as was there built, can only be built where the builder owns the entire soil, and he is under no obligation to ask any rights of the public. It could not be built in the streets of a city, and in the absence of an express declaration of such intention, a court would not be warranted in assuming that an individual was desiring, or that a city council was consenting, that the streets of a city should be illegally obstructed by railway tracks for a mere private use. If such an intention did appear, it would, undoubtedly, be the duty of courts to enjoin the laying of the tracks. But railway tracks, although built with private means, and for the express purpose of directly benefiting the builder by the facilities thus afforded for transportation, but with no design to exclude the public from the equal right of the use of them, are not within the private control of the builder, nor for private use, in a legal sense. Anyone may, that chooses, make donations of money and property in aid of the extension of lines of railway in order to bring their facilities to his own door, but so long as such extensions are operated by the railway company, as are other parts of its lines, for the public benefit, the use does not become private. If here, in the first instance, the Chicago and Northwestern Railway Company had built these tracks, and operated them precisely as it must operate them after they shall be built,—that is, as other parts of its line, in like situation, are operated,—no one would pretend that the use was private; and yet, then, as now, by the accident of

location, the canal and dock company and Bullen & Co. would derive great advantage therefrom. In this class of cases the private contribution only places a public use where it can be enjoyed by the contributor,—in other words, puts him, as respects railway advantages, where other interests more favorably located were, without a contribution.

Being of opinion that the ordinances are valid, and that the tracks may lawfully be laid in the streets, *Attorney General* v. *Chicago and Evanston Railroad Co.* 112 Ill. 520, has no application. The case is governed by *Stetson* v. *Chicago and Evanston Railroad Co.* 75 Ill. 74, *Truesdale* v. *Grape Sugar Co. supra,* and *Mills* v. *Parlin, supra.*

The decree of the circuit court and the judgment of the Appellate Court are reversed, and the cause is remanded to the circuit court, with directions to that court to dissolve the injunction and dismiss the bills.

*Judgment reversed.*